UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SUSAN B. BRAND,

                                        Plaintiff,          **OPINION & ORDER**

        - against -                                          No. 19-CV-7263 (CS)

NEW ROCHELLE CITY SCHOOL DISTRICT,
JOSEPH WILLIAMS, KIMMERLY NIEVES,
and URAL HOGANS,

                                        Defendants.
-------------------------------------------------------------x

<u>Appearances</u>:

Marshall Bellovin
Ballon Stoll P.C.
New York, New York
*Counsel for Plaintiff*

Michael A. Miranda
Miranda Slone Sklarin Verveniotis, LLP
Mineola, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 51.)

For the following reasons, the motion is GRANTED.

## I.      <u>BACKGROUND</u>

        This case arises out of alleged race-based discrimination and retaliation,

defamation, and intentional infliction of emotional distress ("IIED") that Plaintiff Susan

Brand claims to have experienced at her workplace.

A.      **Facts**

The following facts are based on Defendants' Local Civil Rule 56.1 Statement,

Plaintiff's responsive 56.1 Statement, and supporting materials, and are undisputed

except as noted.[1]

1.      **Background**

Plaintiff Susan Brand is a white teacher who has been employed by the New

Rochelle City School District (the "District") and has worked at the Jefferson Elementary

School ("Jefferson") for twenty-one years.  (Ds' 56.1 Stmt. ¶¶ 3, 9.)  She currently

teaches fifth grade.  (*Id.* ¶ 5.)

Defendant Kimmerly Nieves has been the Principal of Jefferson since 2010.  (*Id.*

¶ 10.)  One of her responsibilities is to periodically evaluate teacher performance.  (*Id.*

¶ 23.)  She has always given Plaintiff positive evaluations, rating Plaintiff as a "Highly

Effective" teacher.  (*Id.* ¶ 25.)[2]

Defendant Ural Hogans is a tenured third-grade teacher at Jefferson.  (*Id.* ¶¶ 13-

14.)  He is also the school's basketball coach.  (*Id.* ¶ 17.)  In March 2019, Hogans was

---

[1] Plaintiff purports to dispute facts recited in Defendants' Local Rule 56.1 Statement, (ECF No. 55 ("Ds' 56.1 Stmt.")), but fails to identify the grounds for disputing the facts and fails to point to evidence or affidavits that provide a basis for any such dispute.  (*See* ECF No. 57 ("P's 56.1 Resp.").)  Under Local Rule 56.1, any portion of Defendants' Local Rule 56.1 Statement that is properly supported, and that Plaintiff does not specifically deny *with evidence*, is deemed admitted for purposes of this motion. *See, e.g.*, *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (summary order); *Wallace v. City of N.Y., Dep't of Educ.*, No. 20-CV-1424, 2021 WL 6127386, at *1 n.1 (S.D.N.Y. Dec. 28, 2021); *Universal Calvary Church v. City of N.Y.*, No. 96-CV-4606, 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000); L.R. 56.1(c); L.R. 56.1(d).

[2] The rating scale used for teacher evaluations at Jefferson has four categories: Highly Effective, Effective, Developing, and Ineffective.  (*Id.* ¶ 24.)

"the only black or African American full-time teacher at Jefferson." (ECF No. 52-4 ("Hogans Depo.") at 59:17-20; Ds' 56.1 Stmt. ¶ 16.)[3]

Defendant Dr. Joseph Williams was employed by the District in various roles from 1988 until he retired in June 2019. (Ds' 56.1 Stmt. ¶ 18.) From 2015 through 2019, he was the Assistant Superintendent for Human Resources for the District. (*Id.* ¶ 19.)

### 2. Before March 2019

Prior to March 2019, parents complained multiple times about Plaintiff and her inability to connect with their children. (*Id.* ¶ 26.)[4] Nieves addressed parents' concerns by speaking with Plaintiff and suggesting strategies to avoid issues going forward. (*Id.* ¶ 27.)[5]

---

[3] Plaintiff denies this statement without providing any explanation or citation to evidence in the record. (P's 56.1 Resp. ¶ 16.) As discussed, *see* note 1, responses that "do not point to any evidence in the record that may create a genuine issue of material fact[ ] do not function as denials, and will be deemed admissions of the stated fact." *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (cleaned up); *see Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (deeming facts in defendants' 56.1 statement admitted where plaintiff failed to specifically dispute defendants' statements with evidence). It is not the job of a district judge to sift through the entire record or even entire documents in search of a fact dispute. Because inadequate responses like this one (among others) do not meet the burden under Rule 56(c) to cite particularized evidence showing a genuine dispute, the Court deems the corresponding facts admitted. *See, e.g.*, *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 291-92 (2d Cir. 2000) (affirming district court's grant of motion for summary judgment for defendants where plaintiffs' counterstatement failed to set forth particularized evidence showing a triable issue); *Johnson v. City of N.Y.*, No. 10-CV-6294, 2012 WL 1076008, at *3 (S.D.N.Y. Mar. 28, 2012) (court is not obligated "'to perform an independent review of the record to find proof of a factual dispute'") (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 121 (2d Cir. 2004)).

[4] Plaintiff "admit[s] that over twenty-one (21) years of teaching, there have been multiple complaints by parents," but "otherwise denie[s]" Defendants' statement. (P's 56.1 Resp. ¶ 26.) The Court deems Defendants' statement admitted. (*See* notes 1, 3.)

[5] Plaintiff "denie[s]" this statement, but the Court deems it admitted. (*See* notes 1, 3.)

Plaintiff testified that before March 2019 she had been retaliated against for years for advocating for her students or team members. (*Id.* ¶¶ 117-18.)[6]  Before March 2019 Plaintiff never accused anyone of retaliating against her because she was white. (*Id.* ¶ 119.)

### 3.   After-School Program

Plaintiff alleges that in March 2019, "it came to [her] attention," (ECF No. 6 ("AC") ¶ 22), that a student was consistently missing an after-school academic program (the "after-school program") to attend basketball practice, (*id.* ¶ 24; Ds' 56.1 Stmt. ¶ 34). In response to Plaintiff's concern, Nieves spoke with the after-school program teachers and contacted Hogans. (Ds' 56.1 Stmt. ¶¶ 36-37.)  The teachers informed Nieves that the student only had two absences, which was consistent with the after-school program attendance records, which Nieves checked. (*Id.* ¶¶ 37, 55.)  Around March 18, 2019, Plaintiff inspected the attendance records herself. (*Id.* ¶¶ 49-50.)  The records for the period January 29 to April 25, 2019 show that the student attended twenty-six of the

---

[6] Plaintiff inexplicably – and, frankly, frivolously – denied this fact. (P's 56.1 Resp. ¶¶ 117-18.)  But she testified at her deposition that "all of this retaliation, this didn't just start in 2019.  That's when I filed a lawsuit.  [Nieves has] been retaliating against me for years." (ECF No. 52-2 ("P's Depo.") at 197:3-6.)  (Plaintiff's deposition is split between two docket entries, ECF Nos. 52-1 and 52-2, but for simplicity I will cite to the document as a whole as "P's Depo.")  She asserted that there were numerous instances of retaliation "throughout [her] career at Jefferson." (*Id.* at 197:12-14.)  When asked about a particular incident of alleged retaliation in April 2018, Plaintiff stated that she was "[a]lways" retaliated against for "[s]peaking out," adding, "I advocate for my team members and I advocate for my students.  Whenever I advocate for something that isn't what Ms. Nieves feels is warranted, then she acts." (*Id.* at 200:2-11.)  When asked why she was retaliated against for the 2018 incident, Plaintiff responded, "It wasn't a specific thing.  This is – this goes on.  It could have been something I said at a faculty meeting.  It could have been something I said in an e-mail.  This has been going on for years." (*Id.* at 201:9-18.)

twenty-eight after-school classes.  (*Id.* ¶ 55).[7]  Plaintiff did not believe the teachers or the attendance records.  (*Id.* ¶ 38; P's 56.1 Resp. ¶ 55.)[8]

After Nieves spoke with Hogans, Hogans spoke with Ms. Giordano, an after-school teacher.  (Ds' 56.1 Stmt. ¶ 39.)  Ms. Giordano told Hogans that the student missed the after-school program once for picture day and possibly on one or two other days.  (*Id.*)[9]  Hogans also spoke to the student, and although the student reported that he had not been missing the after-school program, Hogans still took the opportunity to remind him, "[Y]ou know you're supposed to be going."  (Hogans Depo. at 33:6-14; *see* Ds' 56.1 Stmt. ¶ 40.)[10]

After speaking with the student and Ms. Giordano, Hogans went to share what he had learned with Plaintiff.  (Ds' 56.1 Stmt. ¶ 41.)  Hogans stood in the doorway of the classroom where Plaintiff, her partner teacher Ms. Desillas, and a student teacher were

---

[7] Plaintiff's 56.1 Response states, "Admitted that attendance records, as completed by certain teachers, reflect this, otherwise denied."  (P's 56.1 Resp. ¶ 55.)

[8] Plaintiff and her partner teacher spoke to the student and obtained what they regarded as a confession, which they had the student put in writing.  (Ds' 56.1 Stmt. ¶¶ 52-54; ECF No. 58-2 ("P's Aff.") ¶¶ 14-16.)  The student's note, dated March 15, 2019, reads:

> W[h]y I was not going to after school because I was thinking to go on wednesday I go but on thursday I doun't go.  Next week I doun't go on Wednesday and I do go on Thursday.  That was sort of my operation.  Mrs. G[i]ordano said that I mist 2 days.  I do go on Tuesdays because I have nothing to due.  Ms. Trace said I mist 1 day.  Two out of three days I go to after school.

(ECF No. 52-36.)

[9] Plaintiff denies this portion of this statement without providing any explanation or citation to evidence in the record.  (P's 56.1 Resp. ¶ 39.)  The Court deems Defendants' statement admitted.  (*See* notes 1, 3.)

[10] Plaintiff denies this statement without providing any explanation or citation to evidence in the record.  (P's 56.1 Resp. ¶ 40.)  The Court deems Defendants' statement admitted.  (*See* notes 1, 3.)

eating during their lunch break, and told Plaintiff that the student had only missed the after-school program for the team picture and on one or two other days.  (*Id.* ¶ 42.) According to Hogans, Plaintiff "seemed to get defensive," and stated that other students had told her that the student had not been attending the after-school program.  (Hogans Depo. at 36:10-13; *see* Ds' 56.1 ¶ 43.)  Plaintiff in her deposition described feeling intimidated because Hogans raised his voice and had his arms crossed.  (P's Depo. 158:13-14.)[11]  After her conversation with Hogans, Plaintiff complained to Nieves, alleging that Hogans had made her feel uncomfortable by the way he spoke to her.  (Ds' 56.1 Stmt. ¶ 45.)

### 4.   The March 22, 2019 Meeting

Hogans requested a meeting to address the tension between himself and Plaintiff stemming from their encounter regarding the student's attendance at the after-school program.  (*Id.* ¶ 56.)  He emailed Plaintiff and Ms. Desillas, asking if they were available to meet "because he believed there had been a misunderstanding," and he wanted to "clear the air."  (*Id.* ¶¶ 57-58.)  Plaintiff and Ms. Desillas wanted the Human Resources Department (*i.e.*, Assistant Superintendent Williams) to attend, but the Human Resources Department deferred and the issue was handled on the building level.  (*Id.* ¶ 60.)  The meeting took place on March 22, 2019 and Plaintiff, Hogans, Nieves, Ms. Desillas, and Assistant Principal Bruno attended.  (*Id.* ¶ 62.)

---

[11] In her affidavit, Plaintiff describes Hogans as "visibly upset and angry," and having "his arms crossed defensively" during this conversation. (P's Aff. ¶¶ 21-22.)  Ms. Desillas in her affidavit uses the same words in describing Hogans.  (ECF No. 58-14 ¶¶ 13-14.)  Williams, who later investigated the event, stated that the student teacher who was present did not indicate that Hogans acted in an inappropriate or intimidating manner.  (ECF No. 52-5 ("Williams Depo.") at 40:21-41:4; *see* Ds' 56.1 Stmt. ¶ 46.)

At the meeting, Hogans provided his perspective on the interaction with Plaintiff. (*Id.* ¶ 63.)  He explained that Plaintiff was defensive, that Plaintiff's issues were about more than just the student's attendance, and that he believed Plaintiff's treatment of him could have been racially motivated or because he was a man.  (*Id.*)  Plaintiff asked whether Hogans was calling her a racist, (*id.* ¶ 64), and Hogans responded that he thought Plaintiff's actions were racially driven, (*id.* ¶ 65).  Plaintiff then asked Hogans for examples that formed the basis of his belief that she was racist, and Hogans responded that he felt that Plaintiff treated him differently than other teachers and coaches, that she never greeted him when they passed in the hall, and that Plaintiff did not send her students to an emergency basketball meeting that he had called, but allowed her students to attend a soccer meeting held by the white soccer coach.  (*Id.* ¶¶ 68-70.)[12]

Plaintiff alleges that she asked Nieves how she could allow Hogans to make such accusations, but Nieves did not rebuke him.  (*Id.* ¶ 71; P's Aff. ¶¶ 38-39.)  Nieves concluded the meeting by saying that she "could not solve sexism[13] and racism in a 30-minute meeting," (ECF No. 52-3 ("Nieves Depo.") at 36:15-17; Ds' 56.1 Stmt. ¶ 72), that both Plaintiff and Hogans implied things about each other, and that it was "unfortunate" that they could not "clear this up," (Hogans Depo. at 44:13-16; Ds' 56.1 Stmt. ¶ 72).  Plaintiff was upset that Nieves did not reprimand Hogans for accusing her of being a racist and said that she would be filing a complaint.  (P's 56.1 Resp. ¶ 71.)

---

[12] Plaintiff "[a]dmitted that [she] did not send her students to any sports meetings during instructional time," but "otherwise denied" the statement.  (P's 56.1 Resp. ¶ 70.)

[13] At some point during the meeting Plaintiff suggested that Hogans was sexist, Hogans said that no female in the District has ever said that he has been disrespectful towards women, and Plaintiff responded saying that she was not sure that that was true. (Ds' 56.1 Stmt. ¶¶ 66-67.)

### 5.      The District's Response to Plaintiff's Complaint

Plaintiff filed a complaint with the District on March 27, 2019.  (Ds' 56.1 Stmt. ¶ 73; P's Aff. ¶ 47.)[14]  On April 4, 2019, Nieves emailed Plaintiff, "I have been thinking about you and I want you to know that if you would like to talk, I would be more than happy to meet with you."  (ECF No. 52-46.)  Plaintiff responded, "I'm not sure to what you are referring.  If you feel we need to discuss something about my professional responsibilities please let me know.  Thank you."  (*Id.*)  Nieves replied, "I was just checking in with you.  I have no agenda."  (*Id.*)

Williams conducted an investigation by interviewing and taking statements from the involved parties, including Plaintiff, Nieves, Hogans, Ms. Desillas, Assistant Principal Bruno, Ms. Giordano, and the student teacher.  (Ds' 56.1 Stmt. ¶ 76.)  Williams did not uncover any evidence that Plaintiff was called "a racist."  (*Id.* ¶ 77; Williams Depo. at 41:5-10.)[15]

By letter dated May 16, 2019, the District (through Assistant Superintendent Williams) advised Plaintiff to immediately report, in writing, any alleged discrimination or retaliation.  (Ds' 56.1 Stmt. ¶ 134.)  The District also advised Plaintiff that its counsel would be conducting an independent investigation of Plaintiff's allegations.  (*Id.* ¶ 135.)

---

[14] Although the District and Plaintiff both describe Plaintiff "fil[ing]" a complaint, no written complaint has been provided, and Williams described an in-person meeting at which Plaintiff raised her complaint by reading from notes.  (Williams Depo. at 17:18-22; *see* P's Aff. ¶ 46.)

[15] Plaintiff denies this statement without providing any citation to evidence in the record.  (P's 56.1 Resp. ¶ 77.)  The Court deems Defendants' statement admitted.  (*See* notes 1, 3.)

On May 22, 2019, Plaintiff emailed Williams detailing an "incident of retaliation by Ms. Nieves." (ECF No. 52-37 at 2.)[16] Williams responded the next day, advising Plaintiff that her email "and all allegations raised therein, will be included in the independent investigation conducted by counsel" and reminding Plaintiff that she should "advise this office immediately, in writing, of any further alleged discrimination and/or retaliation related to this matter." (*Id.* at 1; *see* Ds' 56.1 Stmt. ¶ 136.) In the fall of 2019, Peter Scordo of the District's Human Resources Department became the contact for Plaintiff's complaints. (Ds' 56.1 Stmt. ¶ 137.) In November 2019, after Plaintiff filed this lawsuit, Mr. Scordo received a complaint from Plaintiff about unspecified retaliation and again advised her to continue providing her complaints in writing. (ECF No. 52-39.)

### 6. Post-Meeting Events

Plaintiff alleges that Nieves "gossiped" about what transpired at the March 22, 2019 meeting with Hogans, (Ds' 56.1 Stmt. ¶ 78), that student families heard comments regarding Plaintiff being a racist, (*id.* ¶ 79), and that Nieves did not provide her with required test data to complete student "Response to Intervention" reports, (*id.* ¶¶ 96-97). Regarding the latter, Nieves told Plaintiff that she should submit the relevant forms

---

[16] This allegation is described in section I.A.6.c below.

without test score data and that Nieves would make sure it was filled in.  (ECF No. 52-21.)[17]  Plaintiff was able to locate the test score data herself.  (Ds' 56.1 Stmt. ¶ 102.)[18]

### a.   Teacher's Union Representatives

Plaintiff asserts that "[o]n April 29, 2019, Jefferson's teacher's union representatives sent out an email that they were stepping down," and that "[a]t first, no teachers volunteered to replace them."  (P's Aff. ¶¶ 91-92.)  After Plaintiff volunteered, two of her colleagues – who "had previously acted as teacher's union representatives" and who "had refused to subsequently accept the position again" – "suddenly" volunteered.  (*Id.* ¶¶ 93-95.)  Plaintiff asserts that Nieves asked those two colleagues to volunteer in addition to Plaintiff in order to "protect" herself.  (*Id.* ¶ 96.)

### b.   Hiring Committee

Plaintiff also alleges that in the spring of 2019, she volunteered for but was not selected to be on an unpaid, voluntary hiring committee to find a new Assistant Principal.  (Ds' 56.1 Stmt. ¶¶ 88-90.)[19]  Nieves testified that she did not see Plaintiff's email offering to serve, (Nieves Depo. at 44:6-18; *see* Ds' 56.1 Stmt. ¶ 91), and that Plaintiff

---

[17] Plaintiff denies Defendants' assertion in its Rule 56.1 statement that Nieves told Plaintiff to submit her forms without the test score data and that she would ensure that the data was filled in.  (P's 56.1 Resp. ¶ 101.)  Defendants' Rule 56.1 statement cited the wrong exhibit, but the Court deems this statement admitted based on its review of the record.  (*See* ECF No. 52-21.)

[18] Plaintiff's response to Defendants' statement is that she was "eventually able to find the missing test score data despite Defendant Nieves and the administrators' unprofessionalism, otherwise denied."  (P's 56.1 Resp. ¶ 102.)

[19] Plaintiff refers to these events as happening in April 2020, (*see* ECF No. 56 ("P's Opp.") at 8; P's Aff. ¶¶ 104-06), but admits that the committee sat in the spring of 2019 in her responsive 56.1 Statement, (P's 56.1 Resp. ¶ 89; *see* ECF No. 60 ("Ds' Reply") at 2 n.2).  Nieves testified that "[t]he committee was for the spring of 2019."  (Nieves Depo. at 75:4-7.)

would have been placed on one of the hiring committees had she seen it, as there were two committees and nobody was denied participation, (Ds' 56.1 Stmt. ¶ 92).  Plaintiff admits that she never received a response to her email, (P's Depo. at 307:8-17), and acknowledges that multiple white teachers at Jefferson were chosen for the hiring committees, (Ds' 56.1 Stmt. ¶ 94.)  Plaintiff never made any further inquiry regarding why she was not selected for the committee and the incident had no effect on Plaintiff's tenure, salary, or professional development.  (*Id.* ¶ 95.)[20]

c.   <u>Negative Information</u>

Plaintiff alleged in the Amended Complaint that "Defendant has told parent(s) who specifically sought Plaintiff to instruct their child(ren) that Plaintiff is not nurturing enough for their child(ren) and they should choose another teacher."  (AC ¶ 58.)  By email dated May 21, 2019, Plaintiff reported the following to Williams:

> I am writing to inform you about an incident that was recently brought to my attention.  Last week a parent of a student at Jefferson called [Assistant Principal] Bruno to request that her son be put into my class next year.  [Assistant Principal] Bruno told her, "_____ needs love.  [Plaintiff] is not the right fit for him.  I'm going to put _____ with Mrs. Rizzuto."

(ECF No. 52-12; *see* Ds' 56.1 Stmt. ¶ 107.)[21]  There is no indication that any individual Defendant was involved in this interaction.

In her affidavit, Plaintiff asserts that Nieves "even went as far as making up negative information about which students' parents complained."  (P's Aff. ¶ 57.)  Plaintiff asserts that in May 2019 Nieves "claimed" that a parent complained of a

---

[20] Plaintiff denies this assertion without providing any citation to evidence in the record.  (P's 56.1 Resp. ¶ 95.)  The Court deems Defendants' statement admitted.  (*See* notes 1, 3.)

[21] Former Assistant Principal Bruno is not a party in this action.

"disconnect" between Plaintiff and his son.  (P's Depo. at 283:9-284:22; P's Aff. ¶ 82.)[22]

In response to learning of this parent complaint, Plaintiff, with Ms. Desillas, allegedly

contacted the parent to ask him "about the topics discussed at the meeting."  (P's Aff. ¶¶

83-84.)[23]  According to Plaintiff and Ms. Desillas, the parent relayed that "he did not say

anything to Principal Nieves" about Plaintiff "having a disconnect with his son."  (*Id.* ¶

85; ECF No. 58-14 ¶ 71.)[24]  Plaintiff states that the parent "did not even know what the

word 'disconnect' meant."  (P's Aff. ¶ 86; P's Depo. at 284:8-9.)  Despite Plaintiff's

argument to the contrary, it is clear that the parent complained about Plaintiff.  An

individual who apparently is the parent to whom Plaintiff refers put his concerns about

Plaintiff in an email addressed to Nieves.  (ECF No. 52-9.)[25]

---

[22] Nieves relayed this information to Plaintiff after meeting with the student's parent.  (P's Aff. ¶ 82.)  Plaintiff was not invited to the parent meeting.  (*Id.* ¶ 80.)  Ms. Desillas was invited to and attended the meeting.  (*Id.* ¶¶ 77, 81; ECF No. 58-14 ¶¶ 63, 71.)  The meeting concerned what Plaintiff refers to as a "shared student," which presumably means that the student had more than one teacher.

[23] Plaintiff testified that if she spoke to a Spanish-speaking parent, as this parent was, Ms. Desillas "was the one who would go back and forth translating" because she speaks Spanish.  (P's Depo. at 285:7-11.)

[24] Plaintiff's affidavit provides that the parent "did not say anything to Principal Nieves . . . about *Ms. Desillas* having a disconnect with his son," (P's Aff. ¶ 85) (emphasis added), but the Court assumes that Plaintiff meant to refer to herself and not Ms. Desillas, (*see* ECF No. 58-14 ¶ 71.)

[25] The parent explained that his son "started to complain about [Plaintiff]" being too strict, favoring other students, ignoring his questions (or making him wait before answering them), and providing only negative comments about his work.  (ECF No. 52-9.)  The parent concluded the email by (i) acknowledging that Plaintiff is capable of "making a good impression" on his son if she "makes the effort," and (ii) thanking Nieves for the meeting they had earlier that day.  (*Id.*)  Plaintiff denies the content of the parent's complaint, (P's 56.1 Resp. ¶ 110), despite it being documented in an email from the parent, (ECF No. 52-9), perhaps under the misconception that Plaintiff not agreeing with the contents of the complaint or the student's characterization of her conduct is a basis for denying that the statements were made.

Plaintiff also asserts that in December 2019, after Plaintiff had filed her complaint in this case, Ms. Austin, a non-party school administrator, falsely accused her of drafting a letter for a student's mother.  (P's Aff. ¶¶ 60-63.)  According to Plaintiff, Ms. Austin told her that a student's "mother informed her and Principal Nieves that Ms. Desillas and [Plaintiff] had written a letter on behalf of [the student's] mother" and "merely gave it to [the student's] mother to sign."  (*Id.* ¶ 60.)  Plaintiff denies writing the letter but admits that she told the mother what to say in the letter.  (*Id.* ¶¶ 67-69.)

Plaintiff also asserts that Nieves told Plaintiff that a parent complained that Plaintiff "only had negative things to say about [the parent's] child" during a parent-teacher conference, when, "[i]n actuality, the parent that Principal Nieves referred to did not show up at the . . . parent-teacher conferences," and Plaintiff had never met the parent.  (*Id.* ¶¶ 71-74.)

d.   Training Workshop

Plaintiff also claims that in January 2020, Nieves did not approve her request to attend a professional training workshop for "DreamBox," which is a program that helps students learn mathematics and allows teachers to monitor student progress.  (Ds' 56.1 Stmt. ¶¶ 141-43; *see* ECF No. 58-8.)  Plaintiff never contacted Nieves before registering for the class, (Ds' 56.1 Stmt. ¶ 145), even though teachers typically speak with or email Nieves to get approved for the program, (*id.* ¶ 144).  According to Nieves, Ms. Mancuso, the math coach, told her that "she and others, including plaintiff, wanted to attend" the training, and that, in response, Nieves "told her that all had [her] approval," and that "the District home office also has to approve."  (ECF No. 53 ¶ 9.)  Sometime thereafter, Ms. Mancuso told Nieves "that she was attending, but that plaintiff was apparently not

13

approved." (*Id.*)  Nieves says that she "indicated [that she] had not received any requests

regarding plaintiff, and advised [Ms. Mancuso] to encourage plaintiff to re-apply."  (*Id.*)

A screenshot of a computer program indicates that on January 7, 2020, Nieves denied

approval for Plaintiff to attend.  (ECF No. 58-9.)[26]

e.  <u>Favoritism</u>

Plaintiff asserts in her affidavit that Nieves "strongly favors those teachers in her

'inner circle,' many of whom are African-American, Latina, or non-white."  (P's Aff.

¶ 112.)  But Plaintiff concedes in her deposition that many of the teachers in Nieves's so-

called "inner circle" are white.  (P's Depo. at 115:21-117:23.)

### 7.  Terms and Conditions of Employment

"In 2019, when the alleged events giving rise to this action took place, Plaintiff

was paid a salary of $126,000 per year by the District."  (Ds' 56.1 Stmt. ¶ 6.)  Since the

commencement of this action, Plaintiff's salary increased to $131,000 per year.  (*Id.* ¶ 7.)

Plaintiff continues to work in her tenured fifth-grade teaching position and receives the

same benefit package that she has received prior to filing this lawsuit.  (*Id.* ¶¶ 5, 8.)

### B.  <u>Procedural History</u>

Plaintiff filed a Charge of Discrimination with the Equal Employment

Opportunity Commission ("EEOC") alleging that Defendants discriminated against her

on the basis of race.  (AC ¶ 8.)  A notice of right to sue was issued on May 6, 2019.

(ECF No. 6-1; *see* AC ¶ 9.)

---

[26] The screenshot was included in Plaintiff's opposition papers.  (ECF No. 58-9.)
Defendants allege that it was not produced in discovery and should be disregarded.  (ECF
No. 59 ¶¶ 6-9.)  I will consider it but it makes no difference to the outcome.

Plaintiff filed a Complaint with this Court on August 2, 2019, alleging four causes

of action:  (1) discrimination in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*,

(2) discrimination in violation of the New York State Human Rights Law ("NYSHRL"),

(3) retaliation in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*, and (4) retaliation in

violation of the NYSHRL.  (ECF No. 1.)  On August 22, 2019, Plaintiff filed an

Amended Complaint, adding causes of action for defamation of character and IIED.  (*See*

AC ¶¶ 88-96.)[27]

After the close of fact discovery, Defendants filed a pre-motion letter in

anticipation of their motion for summary judgment.  (ECF No. 47.)  Plaintiff responded,

(ECF No. 48), and the Court held a pre-motion conference and set a briefing schedule,

(Minute Entry dated Mar. 16, 2021).  The instant motion followed.  (ECF Nos. 51-60.)

## II.   **LEGAL STANDARDS**

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it

"might affect the outcome of the suit under the governing law . . . .  Factual disputes that

are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary

---

[27] Plaintiff makes passing references to the New York City Human Rights Law
("NYCHRL") in her complaints, (ECF No. 1 ¶¶ 1, 66; AC ¶¶ 1, 70), and in her
memorandum of law, (P's Opp. at 1), but the NYCHRL does not apply to events
occurring entirely in New Rochelle.

judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or

"grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.   **DISCUSSION**

Claims of discrimination and retaliation under Title VII are analyzed using the familiar burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016) (discrimination claims); *Spencer v. Int'l Shoppes, Inc.*, 902 F. Supp. 2d 287, 293 (E.D.N.Y. 2012) (retaliation claims).

> Under that framework, a plaintiff must first establish a *prima facie* case of discrimination, which causes the burden of production to shift to the defendant to offer a legitimate, nondiscriminatory rationale for its actions. If the defendant satisfies its burden of production, then the presumption raised by the *prima facie* case is rebutted and drops from the case, such that at the final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.

*Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (cleaned up).  In demonstrating that the employer's proffered reason was not the true reason for the employment decision, a plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (cleaned up).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  *Id.*

17

A.     **Discrimination**

Plaintiff brings a claim under Title VII, alleging that Defendants discriminated against her based on her race.  (AC ¶¶ 65, 72.)  More specifically, Plaintiff argues that Defendants' "decision not to select Plaintiff for training and/or the hiring committee was certainly race-based and based on Plaintiff's well-known classification as a racist."  (P's Opp. at 14-15.)

To establish a *prima facie* case of discrimination, a plaintiff must demonstrate "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Naumovski v. Norris*, 934 F.3d 200, 214 n.39 (2d Cir. 2019) (cleaned up).  Defendants argue that Plaintiff has failed to prove a *prima facie* case of discrimination because she cannot establish the last two prongs.  (ECF No. 54 ("Ds' Mem.") at 8.)

An adverse employment action is one that constitutes "a materially adverse change in the terms and conditions of employment."  *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (cleaned up).  "Such action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 211 (E.D.N.Y. 2014) (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)).  "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (cleaned up).  But "a 'bruised ego,' a 'demotion without

18

change in pay, benefits, duties, or prestige,' or 'reassignment to [a] more inconvenient

job' are all insufficient to constitute a tangible or materially adverse employment action."

*Hayle v. Nassau Health Care Corp.*, No. 08-CV-2396, 2013 WL 6231164, at *5

(E.D.N.Y. Dec. 2, 2013) (alteration in original) (quoting *Burlington Indus., Inc. v.

Ellerth*, 524 U.S. 742, 761 (1998)).  Mere inconveniences like these do not constitute

adverse employment actions unless they are accompanied by "some attendant negative

result, such as a deprivation of a position or opportunity."  *Hill v. Rayboy-Brauestein*, 467

F. Supp. 2d 336, 354 (S.D.N.Y. 2006) (cleaned up).

Plaintiff cites three instances in which she was allegedly treated differently

because of her protected trait:  (1) not being approved to participate in a professional

training workshop, (2) not being chosen to serve on a hiring committee to select an

Assistant Principal, and (3) having other teachers volunteer to be union representatives

after she did.  (P's Opp. at 13-14.)  Defendants argue that these incidents of alleged

disparate treatment are not adverse actions because they did not affect the terms or

conditions of Plaintiff's employment.  (*See* Ds' Mem. at 9-14; Ds' Reply at 1-4.)  I agree.

Regarding the DreamBox training, "[t]he denial of professional training

opportunities may constitute an adverse employment action, but only where an employee

can show material harm from the denial, such as a failure to promote or a loss of career

advancement opportunities."  *Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 55

(S.D.N.Y. 2019) (cleaned up); *see Hill*, 467 F. Supp. 2d at 352 ("When an employee

cannot show material harm from a denial of training, such as a failure to promote or a

loss of career advancement opportunities, there is no adverse employment action.").

Plaintiff has not produced any evidence that missing this training resulted in material

harm, and she has therefore failed to establish that it constituted an adverse employment action. *See Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) ("[Plaintiff] has not alleged any negative consequences resulting from the alleged denial of professional training, and therefore any such denial does not rise to the level of an adverse employment action."); *Sekyere v. City of N.Y.*, No. 05-CV-7192, 2009 WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009) ("Plaintiff does not contend that her position was altered in any way by not receiving some specific training, nor does she contend that she was disciplined, demoted, transferred, or terminated for lack of some fundamental knowledge that should have been provided for her through training. Accordingly, any failure by Defendants to provide Plaintiff with training does not rise to the level of an adverse employment action.").[28]

With respect to Plaintiff not being selected to serve on the unpaid, voluntary hiring committee to find a new Assistant Principal, Nieves testified that she never saw Plaintiff's email, and Plaintiff provides no evidence to the contrary.[29]  But even if Nieves had intentionally rejected Plaintiff, she "has not provided any evidence that exclusion from the committee was or resulted in a materially adverse change in the terms or conditions of her employment, nor that it could possibly affect her opportunities for professional growth or career advancement." *Potash v. Fla. Union Free Sch. Dist.*, 972

---

[28] Plaintiff provides no evidence that she ever questioned why she had been denied the training or sought to take it again, showing that there were no negative consequences, let alone material harm to her career trajectory, from missing the training. Indeed, Plaintiff concedes that she is not in a position from which she could be promoted. (P's Depo. at 300:13-19.)

[29] Plaintiff testified that she volunteered to serve on the committee by responding to an email from Nieves.  (P's Depo. at 301:24-302:5.)  Defendants point out that "the email has not been produced at bar or ever seen by Nieves."  (Ds' Mem. at 11.)

F. Supp.2d 557, 585 (S.D.N.Y. 2013) (cleaned up) (exclusion from technology grant committee not adverse action). Plaintiff fails to distinguish or even address the case law cited by Defendants in support of their argument that not being selected for a committee does not constitute an adverse action. (Ds' Mem. at 11 (citing *Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381, 399-400 (S.D.N.Y. 2008); *Scafidi v. Baldwin Union Free Sch. Dist.*, 295 F. Supp. 2d 235, 239-40 (E.D.N.Y. 2003)).)

Plaintiff also argues that "Defendant Nieves pushed two teachers who were members of" what Plaintiff refers to as "the Inner Circle . . . to 'volunteer' as teacher's union representatives after she found out that Plaintiff had volunteered to be such a representative." (P's Opp. at 14.) She adds that "[t]hese teachers had previously refused to accept such positions, and only 'volunteered' because Defendant Nieves asked them to 'protect' her from Plaintiff" and that "[t]his forced Plaintiff to forego the opportunity for professional advancement." (*Id.*)[30] Assuming that Plaintiff's belief as to why these other teachers volunteered is true – which is far from clear – Plaintiff does not explain how her "professional advancement" as a teacher was stymied by not serving as a union representative, or any other reason why the presence of competition for the position could

_____

[30] Plaintiff provides no citation to the record in support of these arguments. With no help from counsel, the Court found some support in Plaintiff's deposition transcript and affidavit. Plaintiff testified that she "decided to step up and volunteer to be a union . . . representative" when she heard "that [the former union representatives] were stepping down," and that once she volunteered, "all of a sudden Holly Bruni and Lorraine Wetmore decided they're going to volunteer." (P's Depo. at 298:10-25; *see* P's Aff. ¶¶ 91-95.) Plaintiff added that "[i]t was brought to [her] attention that Ms. Nieves asked them to volunteer to be union reps." (P's Depo. at 299:2-5; *see* P's Aff. ¶ 96.) This assertion – offered to prove that Nieves asked the other teachers to volunteer – is hearsay but the Court considers it for the sake of argument.

reasonably be construed as affecting the terms and conditions of her employment, let alone in a material and adverse fashion.

As Defendants assert, Plaintiff admits that she has "received nothing but positive evaluations from Nieves," "that her job responsibilities have not changed," that "[h]er salary has actually increased since the March 2019 meeting, and that she currently receives the same benefit package." (Ds' Reply at 1 (citing P's 56.1 Resp. ¶¶ 5-8, 24-25).) She has thus failed to meet the adverse-action prong of her *prima facie* case.

Even assuming that the alleged incidents constitute adverse employment actions – and they do not – there is no indication that they occurred under circumstances giving rise to an inference of discrimination. Plaintiff does not tie any of the alleged conduct to her race. She merely argues – in a conclusory fashion – that she "believes she was not selected for work opportunities based on the fact that she was labeled a 'racist'" and that "[t]he decision not to select Plaintiff for training and/or the hiring committee was certainly race-based and based on Plaintiff's well-known classification as a racist." (P's Opp. at 14-15.)[31] Plaintiff seems to rely on the fallacy that because she belongs to a protected class, it is reasonable to conclude that anything negative that happened to her at work was because of her membership in that class. *See Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have

---

[31] Plaintiff makes a passing reference to "similarly situated employees," (P's Opp. at 16), but does not identify these employees or explain how they were similarly situated. Likewise, she alleges that Nieves allegedly favored teachers in her "inner circle" but concedes that many of them are white. (P's Depo. at 115:21-117:23.)

been related to his race.") (cleaned up); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class") (cleaned up).[32]  For a jury to agree that the events to which Plaintiff points were based on her race – as opposed to, say, innocent mistakes, unrelated motives, or even Nieves simply not liking Plaintiff – would be sheer speculation.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's discrimination claim.

**B.    <u>Retaliation</u>**

Plaintiff also alleges that Defendants retaliated against her because she filed a formal complaint with the District.  (P's Opp. at 5-10.)  To establish a *prima facie* case of

---

[32] Defendants argue that "where 'reverse discrimination' is alleged, as at bar, plaintiff must point to 'background circumstances that support the suspicion that the defendant is the unusual employer who discriminates against the majority.'"  (Ds' Mem. at 9 (quoting *Olenick v. N.Y. Tel./A NYNEX Co.*, 881 F. Supp. 113, 114 (S.D.N.Y. 1995).)  Defendants add that Plaintiff's allegations "would be inadequate to make out a discrimination . . . case even if this was a conventional discrimination case brought by a member of a racial minority."  (*Id.*)

The Second Circuit in *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73 (2d Cir. 2009), explained in a footnote that it would not decide whether a "Title VII plaintiff who alleges discrimination on the basis that he is white . . . must proffer evidence of background circumstances reflecting that the defendant is that unusual employer who discriminates against the majority."  *Id.* at 80 n.5 (cleaned up).  But courts in this District have found that white plaintiffs are not held to a higher standard in Title VII cases.  *See Pesok v. Hebrew Union Coll.-Jewish Inst. of Religion*, 235 F. Supp. 2d 281, 286 (S.D.N.Y. 2002) (on summary judgment); *Tappe v. All. Cap. Mgmt.*, 177 F. Supp. 2d 176, 181-83 (S.D.N.Y. 2001) (on motion to dismiss).

Either way, for the aforementioned reasons the Court agrees with Defendants that Plaintiff's allegations are "inadequate to make out a . . . conventional discrimination case brought by a member of a racial minority."  (Ds' Mem. at 9.)

retaliation, "an employee must show that (1) [s]he was engaged in protected activity, (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020) (cleaned up).  Defendants argue that Plaintiff fails to adequately support the third and fourth factors.  (Ds' Mem. at 14-15.)

To establish an adverse employment action in the context of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (cleaned up).  "Title VII is not a general 'bad acts' statute," *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (cleaned up), and "'[p]etty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation," *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *White*, 548 U.S. at 68).

Defendants argue that "Plaintiff's continuous complaints show that she was never dissuaded from reporting any alleged act of retaliation."  (Ds' Reply at 5-6; *see* Ds' Mem. at 14-15.)  Oddly, Plaintiff acknowledges the governing standard, (P's Opp. at 18 (citing *White*, 548 U.S. at 57)), but otherwise ignores Defendants' argument on this point.

The record reflects that, after filing her formal complaint with the District on March 27, 2019, Plaintiff reported additional allegations of discrimination or retaliation

by email on May 17, 2019, (ECF No. 52-44),[33] May 21, 2019, (ECF No. 52-12),[34]

November 5, 2019, (ECF No. 52-28),[35] December 15, 2019, (ECF No. 52-30),[36] and

January 8, 2020, (ECF No. 52-31).[37]   That Plaintiff continued to make numerous

complaints throughout 2019 and into 2020, after her initial complaint to Human

Resources in March 2019, certainly suggests that the alleged retaliatory acts did not

dissuade Plaintiff from continuing to make complaints.   Although not dispositive, the fact

that Plaintiff continued to make complaints is relevant to the inquiry of whether Plaintiff

suffered a materially adverse action.   *See Levitant v. City of N.Y. Hum. Res. Admin.*, 558

F. App'x 26, 29 n.2 (2d Cir. 2014) (summary order) ("[T]hough not dispositive, it is

relevant that [Plaintiff] himself was not dissuaded from making several more complaints

---

[33] Plaintiff informed Williams of what she refers to as "an incident of retaliation directly related to [her] notification to the district of [her] filing a formal complaint with the EEOC on Friday, May 10, 2019."  (ECF No. 52-44.)  Plaintiff complained to Williams that Nieves had had her secretary present to take notes during a May 13, 2019 meeting about a student and that something called a "Danielson Rubric" was on Nieves's desk.  (*Id.*)

[34] Plaintiff informed Williams that an incident was brought to her attention where "a parent of a student at Jefferson called [the Assistant Principal] to request that her son be put into [Plaintiff's] class next year," and that the Assistant Principal informed the parent that her student "needs love" and that Plaintiff "is not the right fit for him."  (ECF No. 52-12.)

[35] Plaintiff informed Peter Scordo of the District's Human Resources Department of the "continuing retaliation" that she had endured.  (ECF No. 52-28 at 2.)  She detailed several incidents and explained that "[i]f any of these incidents had been the only incident, I would think that it might be a case of miscommunication.  However, the consistency of these attacks makes it clear that Ms. Nieves's focus is to make my work conditions difficult."  (ECF No. 52-28 at 3.)

[36] Plaintiff informed Peter Scordo of "another example of retaliation" relating to the allegedly ghostwritten letter.  (ECF No. 52-30.)

[37] Plaintiff informed Peter Scordo of the District's Human Resources Department about "another example of retaliation by [Principal] Nieves," relating to Nieves denying her request to attend the DreamBox training.  (ECF No. 52-31.)

after suffering these allegedly materially adverse actions."); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011) (finding reasonable employee in Plaintiff's situation would not have been deterred from engaging in protected activities and noting that "while the test is an objective one, it is relevant that [Plaintiff] himself was not deterred from complaining – he complained numerous times"); *Hahn v. Bank of America Inc.*, No. 12-CV-4151, 2014 WL 1285421, at *24 (S.D.N.Y. Mar. 31, 2014) ("Plaintiff . . . was not dissuaded from making additional complaints . . . after suffering the alleged harassment.  While not dispositive, as the standard is objective, this itself suggests that the conduct of which Plaintiff complains did not rise to the level of material adverse action.") (cleaned up).  Because "[w]hether an employer's action could dissuade a reasonable employee, situated similarly to the plaintiff, from making a charge of discrimination is an objective determination," *see Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 585 (S.D.N.Y. 2012), the Court considers whether the alleged instances of retaliation would, objectively, dissuade a reasonable worker from lodging a complaint.  The short answer is no.

Plaintiff claims that after she filed her formal complaint against Hogans and Nieves with Williams on March 27, 2019, (P's Opp. at 18), Nieves (1) ignored "some of Plaintiff's questions and emails and essentially began avoiding all contact with Plaintiff," (*id.* at 5; *see id.* at 18); (2) spoke "poorly of Plaintiff to Plaintiff's colleagues and to parents," (*id.* at 5; *see id.* at 18); (3) excluded Plaintiff from a meeting involving a "student's math difficulties," (*id.* at 6-7; *see id.* at 18-19); (4) marginalized Plaintiff by "favor[ing] those teachers in [Nieves's] 'inner circle,'" (*id.* at 9); (5) excluded Plaintiff from professional development opportunities, (*id.* at 7-8, 19); and (6) "fabricat[ed]

negative information" and parent complaints, (*id.* at 6-7; *see id.* at 18).  These actions do not amount to retaliation either individually or collectively.  *See Tepperwien*, 663 F.3d at 568 ("Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.").[38]

As an initial matter, Plaintiff provides little to no support in her opposition papers for several of her assertions.  For example, Plaintiff provides no support for her argument that *Nieves* spoke "poorly of Plaintiff to Plaintiff's colleagues and to parents of Plaintiff's students."  (P's Opp. at 5.)  Plaintiff cites her own affidavit and testimony, (P's Aff. ¶ 52; P's Depo. at 245:5-246:6), neither of which shows that Nieves spoke poorly about her, and an affidavit from a parent who claims that the "administration" told her that Plaintiff "is not a good fit" for her child," (ECF No. 58-12 ¶ 8).  Plaintiff herself attributed this latter remark to non-party Assistant Principal Bruno, not Nieves.[39]  But even if Nieves

---

[38] They also do not rise to the level of a hostile work environment.  *See Legg v. Ulster County*, 979 F.3d 101, 114 (2d Cir. 2020) ("To prove a hostile work environment claim under Title VII, a plaintiff must establish that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."); *Zoulas v. N.Y.C. Dep't of Educ.*, No. 18-CV-2718, 2021 WL 3932055, at *18 (S.D.N.Y. Sept. 1, 2015) ("Although [Plaintiff] has in her opposition papers recited a laundry list of grievances, they neither individually nor collectively come close to establishing that [Plaintiff] was subjected to a hostile work environment . . . .  They establish instead that [Plaintiff] was, over the course of several years, subjected to the kind of bureaucratic headaches and professional disagreements that beset employees of all stripes."); *Davis-Molina v. Port Auth. of N.Y. & N.J.*, No. 08-CV-7584, 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (finding diminished job responsibilities, exclusion from staff meetings, deliberate avoidance, "cliquish" behavior, among other conduct, insufficient to show hostile work environment), *aff'd*, 48 F. App'x 530 (2d Cir. 2012) (summary order).

[39] On May 21, 2019, Plaintiff emailed Williams, noting that "Ms. LeAnn Bruno," the Assistant Principal, told a parent that Plaintiff "is not the right fit" for her child.  (ECF No. 58-7.)

made the comment, it would be a significant overstatement to say that Nieves spoke

"poorly of Plaintiff to Plaintiff's colleagues and to parents of Plaintiff's students," based

on one comment to a parent.  Moreover, no reasonable jury could conclude that that one

offhand remark was of the sort that would dissuade a reasonable employee from

complaining about discriminatory conduct.  *See White*, 548 U.S. at 67 ("[Title VII's]

antiretaliation provision protects an individual not from all retaliation, but from

retaliation that produces an injury or harm.").[40]

        Plaintiff similarly fails to provide support for her assertion that Nieves favored

teachers in her "inner circle."  Plaintiff again cites her own affidavit, which provides that

"Principal Nieves allows Members of the Inner Circle to do things that other teachers

may not," (P's Aff. ¶ 114), but Plaintiff's affidavit does not mention anything that those

in the "Inner Circle" can do that Plaintiff cannot.  Plaintiff's affidavit also provides that

"teachers outside of Principal Nieves' inner circle were not treated as well by Principal

Nieves and were certainly subject to more scrutiny, if not marginalization."  (*Id.* ¶ 115.)

Again, Plaintiff provides no specifics.  "[A] party cannot create a triable issue of fact

merely by stating in an affidavit the very proposition they are trying to prove."  *See*

*Hicks*, 593 F.3d at 167.  Plaintiff does cite an additional affidavit, the "Affidavit of

Shannon Mulqueen," (ECF No. 58-11), but that affidavit only provides, in totally

conclusory fashion, that Nieves made other employees' jobs difficult, (*id.* ¶ 28).  The

contents of the affidavits are too vague, unrelated, and conclusory to support Plaintiff's

---

        [40] While Plaintiff may have subjectively found the remark offensive, it does not
strike the Court as unusual that an administrator might converse with a parent about the
kind of teacher that might be best for a child, or to acknowledge that some children thrive
with a strict or by-the book teacher, while others thrive with a nurturing or warm-and-
fuzzy teacher.

argument that "[t]eachers outside of the Inner Circle . . . were not treated as well by Defendant Nieves."  (P's Opp. at 9.)[41]  The Court did, however, find some support for Plaintiff's argument in her deposition transcript.  Plaintiff testified that the "inner circle" enjoyed "special privileges," including being allowed to "come in late," "[l]eave early," and "work remotely."  (P's Depo. at 58:3-15.)  Plaintiff also testified that those in the "inner circle" would "[h]ave people help [them] in [their] classroom.  Have people teach for [them].  Make up [their] own schedule during the day so that [they] can have a long lunch.  Give [themselves] the children that [they] want to teach so that [they] have no behavior problems."  (*Id.* at 58:3-21.)[42]

Regardless, assuming that Nieves distanced herself from Plaintiff,[43] spoke poorly about Plaintiff, excluded Plaintiff from a meeting, and "favor[ed]" other teachers, these actions would not dissuade a reasonable employee from making a complaint.  *See White*, 548 U.S. at 68 ("Personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable" retaliation) (cleaned up); *Matsko v. New York*, 18-CV-857, 2022 WL 137724, at *10 n.9 (N.D.N.Y. Jan. 14, 2022) ("silent treatment . . . does not constitute an adverse action" in retaliation case); *Bowen-Hooks*, 13

---

[41] Plaintiff also cites the "Affidavit of Theresa Rizzuto," (*see* P's Opp. at 9), but the Court could not locate this affidavit in her submissions.

[42] The Court found this testimony with no help from Plaintiff's counsel. Plaintiff's counsel did cite portions of Plaintiff's deposition transcript, but the cited testimony lacked specifics.

[43] Nieves states that she "limited [her] interactions with [Plaintiff] in the Fall of 2019 upon the advice of the Administration's Human Resources Director (and counsel), as they were investigating [Plaintiff's] allegations," and because she "became aware that [she] was named in the lawsuit as a defendant."  (ECF No. 53 ¶ 4.)  Plaintiff "was able to communicate with Assistant Principal Roncagliolo, and [Nieves] still attended meetings at which [Plaintiff] was present, and dealt with pressing student issues."  (*Id.*)

F. Supp. 2d at 226 ("petty slights or minor annoyances" are not "material adverse action[s] that would dissuade a reasonable employee from protesting discrimination in the workplace"); *Santiesteban v. Nestle Waters N. Am., Inc.*, 61 F. Supp. 3d at 221, 242 (E.D.N.Y. 2014) (Plaintiff's claim that manager "ignored him completely" after he filed complaint does not rise to level of adverse employment action); *McCullough v. Xerox Corp.*, 942 F. Supp. 2d 380, 387-88 (W.D.N.Y. 2013) ("[B]eing left out of meetings does not amount to an adverse action [in retaliation case], absent a showing that some additional negative consequences flowed from that exclusion.") (collecting cases); *McNutt v. Nasca*, No. 10-CV-1301, 2013 WL 209469, at *22 (N.D.N.Y. Jan. 17, 2013) ("Courts in this Circuit have consistently held that allegations that a plaintiff has been ostracized and isolated by her co-workers or excluded from important meetings are insufficient to establish an adverse employment action [in retaliation case].") (collecting cases); *Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 478 (W.D.N.Y. 2005) (cleaned up) ("Menacing looks, name calling, or being shunned by co-workers does not constitute an adverse employment action [in retaliation case]. Nor does exclusion from meetings [or increased scrutiny].").

Plaintiff's arguments regarding missed professional development opportunities fare no better. That Nieves may have encouraged other teachers to run as union representatives and may have denied Plaintiff's requests to attend a training and be placed on a hiring committee, would not dissuade a reasonable employee from making or pursuing a charge of discrimination. *See Rodriguez v. Nassau County*, No. 16-CV-2648, 2019 WL 4674766, at *14 (E.D.N.Y. Sept. 25, 2019) ("[E]ven [if] Plaintiff had been denied training after the filing of her Verified Complaint, such a denial cannot be viewed

as an adverse employment action in this instance since Plaintiff has not pointed to any evidence that the alleged denial caused her a material employment harm.") (collecting cases), *aff'd*, 830 F. App'x 335 (2d Cir. 2020); *Carpenter v. City of Mount Vernon*, No. 15-CV-066, 2018 WL 4935950, at *6 (S.D.N.Y. Oct. 11, 2018) ("Denial of training is only an adverse [retaliatory] employment action if the employer denies necessary job training to an employee, thereby harming the conditions of her employment."); *Trimble v. All.-DeKalb/Rock-Tenn Co.*, 801 F. Supp. 2d 764, 775 (N.D. Ill. 2011) (plaintiff's "removal from the interview panel" was "not a materially adverse action" in retaliation case because it was "undisputed that participation on the panel was voluntary, and there was no financial [remuneration] to the participants," and because plaintiff "provide[d] no evidence that participation led to promotions or any other benefits"); *cf. Shafer v. Am. Univ. in Cairo*, No. 12-CV-9439, 2014 WL 3767007, at *16 (S.D.N.Y. July 31, 2014) (cleaned up) ("Although many professors might celebrate being barred from committee work, in the context of an assistant professor applying for tenure at a school that weighs 33 percent of the tenure decision on service to the school, preventing [Plaintiff] from participating in faculty committees could also dissuade others from engaging in protected activity.").[44]

The only *arguably* adverse action that Plaintiff raises in her opposition papers is that Nieves "fabricat[ed] negative information about which students' parents complained," (P's Opp. at 6; *see id.* at 18), which allegedly forced Plaintiff "to expend

---

[44] As to the voluntary hiring committee, Plaintiff does not respond to Defendants' argument, (Ds' Mem. at 11), that she has not produced the email that she says she sent but that Nieves says she never saw, (Nieves Depo. at 44:6-9).

copious amounts of time documenting, disproving or corroborating such complaints," reduced "the amount of time [she] could devote to lesson planning and other constructive elements of [her] job as a fifth grade teacher," and "creat[ed] a hostile environment in which no teacher could possibly function," (*id.* at 7).  The evidence that Nieves in fact fabricated complaints is lacking.  With respect to the complaint by the parent who said he did not use the word "disconnect," it is not surprising that a parent who is not a native English speaker might not know or use that word, despite Nieves's assertion or belief that he had.  The fact that Nieves summarized the complaint using a word that the parent did not use hardly shows that she fabricated the parent's concerns, which he documented. With respect to the ghostwritten letter – an issue raised by an administrator other than Nieves – it seems obvious that this incident was a simple miscommunication, as Plaintiff admits that she told the mother what to say in the letter, and the mother then wrote the letter in Spanish.  The distinction between Plaintiff writing the letter for the mother or telling the mother what to write in the letter is immaterial.  With respect to the parent who complained that Plaintiff was negative in a parent-teacher conference, Plaintiff's assertions that the parent did not attend the conference does not mean that the parent did not complain.

But even assuming both that Nieves fabricated complaints and that these acts could be considered material adverse actions,[45] Plaintiff's retaliation claim would still fail because she points to no evidence suggesting that Nieves fabricated complaints because Plaintiff made a complaint to the District.  *See Hahn*, 2014 WL 1285421, at *25

---

[45] Plaintiff's argument that the fabricated complaints "creat[ed] a hostile environment in which no teacher could possibly function," (P's Opp. at 7), is wholly conclusory.

("Plaintiff has not pointed to any evidence capable of supporting an inference that
[Defendant's] post-complaint conduct was in any way motivated by Plaintiff's protected
activity.").

While temporal proximity can suffice to show causation for purposes of a *prima
facie* case, *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 262 (S.D.N.Y.
2015) (collecting cases), Plaintiff filed her complaint with the District on March 27,
2019.  One of the instances where Nieves allegedly fabricated a complaint seems to have
occurred *before* Plaintiff filed the complaint with the District, (*see* P's Depo. at 246:9-
249:9 (temporally placing allegedly fabricated parent complaint after incident in which
knife was found in closet in Plaintiff's room); Ds' 56.1 Stmt. ¶ 29 (knife incident
occurred in 2018)), and another instance – which, as discussed, sounds more like a
miscommunication between a parent and a non-party administrator than a fabrication –
occurred almost nine months after Plaintiff filed the complaint with the District, (*see* P's
Aff. ¶¶ 57-70; ECF No. 58-14 ¶¶ 45-56).  The alleged May 2019 fabrication is the only
one temporally proximate, but where, as here, "timing is the only basis for a claim of
retaliation, and gradual adverse job actions began well before the plaintiff had ever
engaged in any protected activity, an inference of retaliation does not arise."[46]  *Slattery v.*

---

[46] Plaintiff concedes that the hostility toward her existed throughout her
employment, (P's Depo. at 197:3-7 ("[T]his didn't just start in 2019.  That's when I filed
a lawsuit.  She's been retaliating against me for years.  This is when I stood up for myself
and decided this is enough."); *id.* at 201:18 ("This has been going on for years.")), which
completely undermines her theory of causation.  *See Chan v. NYU Downtown Hosp.*, No.
03-CV-3003, 2006 WL 345853, at *9 (S.D.N.Y. Feb. 14, 2006) ("Because Plaintiff
alleges that she was the victim of 'hostility and harassment' from virtually the day she
was hired, she has not shown that Defendant's actions were causally related to her
discrimination complaints.") (cleaned up).  Plaintiff's argument that "Defendants'
separate retaliatory acts began only after Plaintiff filed her complaint on March 27,
2019," (P's Opp. at 19), is conclusory.  She provides no basis for regarding the post-

*Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) ("If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory.") *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (summary order); *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 757-58 (8th Cir. 2001) (criticism of plaintiff's performance before alleged retaliatory act dispels inference of retaliation).[47]

In short, the actions of which Plaintiff complains are the petty slights – criticism, favoritism, snubbing – that exist in many workplaces and do not collectively amount to retaliatory adverse action. "Individually the actions were trivial, and placed in context they remain trivial. Taken in the aggregate, the actions still did not adversely affect [Plaintiff] in any material way." *Tepperwien*, 663 F.3d at 572 (cleaned up). And even if Plaintiff had shown adverse action, a reasonable jury could not find that it was prompted by her protected activity. Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

## C.   <u>State Law Claims</u>

In addition to Plaintiff's federal claims, Plaintiff further alleges that her rights were violated under New York state law. The "traditional 'values of judicial economy,

---

March 27, 2019 hostility as "separate" from the hostility that, according to her, existed all along. (*Id.*)

[47] Likewise, Plaintiff's "inner circle" argument fails because not only does Plaintiff not allege that she wanted and was denied any of the accommodations that Nieves allegedly gave to her favored teachers, but there is not a shred of evidence that those teachers were favored because Plaintiff made a complaint and they did not. Indeed, it seems that by Plaintiff's account, the "inner circle" long pre-dated any protected activity.

convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having determined that the only claims over which this Court has original jurisdiction should be dismissed, and having considered the factors set forth in *Cohill*, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law causes of action.  *See* 28 U.S.C. § 1367(c)(3).

Accordingly, Plaintiff's state-law claims are dismissed without prejudice.

IV.    **CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.  The federal claims are dismissed with prejudice and the state claims are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 51), and close the case.

**SO ORDERED.**

Dated:  March 7, 2022
White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.